# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

VOCES DE LA FRONTERA, INC.,
 On behalf of itself and its members,
                                    Petitioner,

v.

DAVE GERBER, in his official capacity as
Sheriff of Walworth County;
TODD J. DELAIN, in his official capacity as          Case No. 3:25-cv-1070
Sheriff of Brown County;
CHAD BILLEB, in his official capacity as
Sheriff of Marathon County;
DAVID ZOERNER, in his official capacity as
Sheriff of Kenosha County; and
CHIP MEISTER, in his official capacity as
Sheriff of Sauk County,
                                    Respondents.

_____

## PETITIONER'S REPLY BRIEF IN SUPPORT OF MOTION
## TO REMAND TO WISCONSIN SUPREME COURT

_____

## INTRODUCTION

Respondents fail to meet their burden to show this action was properly removed from the Supreme Court of Wisconsin. Even if they had timely filed their notice of removal, rather than waiting months to see how the Supreme Court would rule on their opposition to the Petition, this Court would be powerless to act on Petitioner's entirely state law-based claims under the doctrine in *Pennhurst*.   Petitioner has advanced a simple proposition – that the Wisconsin Legislature has not authorized immigration arrests, and has prohibited them in Wisconsin Statutes section 818.01.  Respondents argue that they have preemption

defenses to these claims under federal law, but the existence of a defense does not give rise to the right to remove a case to federal court. And these Wisconsin county sheriffs have no right to removal as federal officers under 28 U.S.C. § 1442, because their preemption defense has been overwhelmingly rejected by courts in this Circuit and around the country, and because they act voluntarily, and not under federal authority or control, when they make a decision to honor a detainer or enter a 287(g) agreement.

## ARGUMENT

### A.    The Attempt at Removal Was Not Timely.

Respondents failed to file their Notice of Removal until 103 days after service of the Petition in this action, well outside the thirty days permitted by 28 U.S.C. § 1446. In their opposition to remand, Respondents attempt to postpone the start of the thirty-day window for removal under § 1446 by suggesting there is no legal action proceeding in the Wisconsin Supreme Court before that court agrees to exercise its original jurisdiction. But a review of practice in the Wisconsin Supreme Court illustrates why the Petition begins the thirty-day clock.

Petitioners served Respondents with the Petition on September 18, 2025, and the Supreme Court's Clerk also sent the newly-filed Petition to each of the Respondents the same day. On September 23, the Supreme Court then *ordered* Respondents to file a response to the Petition. *See* Dkt. 12, Exhibits A-C to Petitioner's Memorandum in Support of Motion to Remand. At that point Respondents were aware that they had been sued for making illegal arrests in the form of honoring ICE detainers, and knew what authority, state or federal, they claimed to justify their actions.

The Wisconsin Supreme Court has previously described how issue is joined by the service of the Petition, followed by an order to respond. In a case Respondents cite, *State ex rel. Sonneborn v. Sylvester*, the Court wrote:

> [P]ersonal jurisdiction was supplied by the service of an order to show cause why leave should not be granted. We consider that such personal jurisdiction suffices not only for our determination to take jurisdiction of the controversy

2

described in the petition, but also for our determination of the procedure to be followed and for our ultimate adjudication. We saw no need for a separate complaint under the circumstances, and ordered that the petition, already served, should constitute the complaint.

25 Wis. 2d 177, 183, 130 N.W.2d 569, 572 (1964), *overruled on other grounds by Pavalon v. Thomas Holmes Corp.*, 25 Wis. 2d 540, 131 N.W.2d 331 (1964).

Additionally, the Wisconsin Supreme Court has previously issued preliminary injunctive relief based on a petition being filed, even before issuing a ruling that it would exercise its original jurisdiction over the action. *See Jefferson v. Dane Cnty.*, 2020 WI 90, ¶ 9, 394 Wis. 2d 602, 951 N.W.2d 556 (temporary injunction issued March 31, 2020, order issued accepting original jurisdiction, April 1, 2020).

In the present case, Respondents filed a reply to the Petition (Dkt. 1-2, Ex. A. to Joint Notice of Removal, at 38, hereinafter, the "Response") urging the Wisconsin Supreme Court not to exercise its original jurisdiction, in the same way that a defendant will make a motion to dismiss for lack of jurisdiction in a more traditional lower court setting. The Respondents offer no compelling reason why the discretionary nature of the Supreme Court's decision on its jurisdiction changes the rule for timing of a notice of removal.[1]

Respondents are forced to acknowledge that the practice of the Wisconsin Supreme Court in many recent cases, as in this case, is to require no additional pleadings beyond the petition itself. Respondents' citation to *Lab. & Farm Party v. Elections Bd., State of Wis.,* 117 Wis. 2d 351, 358, 344 N.W.2d 177, 181 (1984) in fact illustrates why the Petition, and not the Court's subsequent actions on the Petition, start the clock. In that case, involving the right of a candidate to be listed on a presidential ballot, the Court's decision on whether to accept the petition, and its decision on the merits, were both part of the single order issued by the Court. *See also James v. Heinrich*, 2021 WI 58, 960 N.W.2d 350 (Wis. 2021) (leave to commence action granted twenty days after petition filed, and temporary injunction granted in same order); *Wisconsin Legislature v. Palm*, 2020 WI 42, ¶ 9, 391

---

[1] Respondents cite *In re Exercise of Original Jurisdiction of Supreme Court*, 201 Wis. 123, 229 N.W. 643, 646 (1930), without including the statement of the Court that "The suggestions herein contained are not intended to have the effect of a rule of court, but are merely by way of suggestion."

Wis. 2d 497, 942 N.W.2d 900 (accepting jurisdiction of original action and ruling without additional pleadings in the action beyond the petition).

Respondents urge this Court to accept as significant that they could not know whether or not the Supreme Court would accept their arguments and decline to exercise original jurisdiction. But Respondents' success or lack of success in opposing the Petition is not the information which triggers the time to remove. The Petition contained the information Respondents now rely on as purported bases for federal jurisdiction, and when Respondents were served, they had thirty days to remove.

Respondents also suggest that the Supreme Court's December 3 order, agreeing to exercise its original jurisdiction and ordering briefing, inserted for the first time a federal cause of action into the case making it removable. That argument is baseless. The Court was asking for briefing on an issue raised as a defense by Respondents, not *sua sponte*. And, as argued *infra* at pages 8-11, a defense based in federal law to state law causes of action does not give rise to grounds for removal (even if it were colorable, which it is not). Moreover, the Supreme Court's briefing order did not create the Sheriffs' relationship with the federal government which they now claim makes them federal officers under Section 1442.

Once the thirty–day window has closed, the removal right is only revived by a subsequent pleading, motion or order that changes the nature of the litigation, such that the case is "substantially a new suit begun that day." *Wilson v. Intercollegiate (Big Ten) Conf. Athletic Ass'n*, 668 F.2d 962, 965 (7th Cir.1982).

Courts have cautioned against allowing defendants, like Respondents here, to test out their arguments before the state court, and failing there to then remove to federal court: "[A] defendant must not be allowed to test the waters in state court [by filing a demurrer] and, finding the temperature not to its liking, beat a swift retreat to federal court. Such behavior falls within the very definition of forum-shopping and is antithetical to federal-state court comity." *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 188 (4th Cir. 2017) (quoting *Estate of Krasnow v. Texaco, Inc.*, 773 F.Supp. 806, 809 (E.D. Va. 1991)) (remanding case defendants sought to remove under 28 U.S.C. § 1442)*;*

*see also Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 163 (4th Cir. 1997) ("[T]he extension of the removal period in the case where the initial pleading does not state the factual or legal bases for removal should not be allowed to cover strategic delay interposed by a defendant in an effort to determine the state court's receptivity to his litigating position.")

If Respondents believed they had a right to remove under §§1441 or 1442, their obligation was to remove within thirty days of receipt of the Petition, not after trying and failing to convince the Wisconsin Supreme Court not to exercise its jurisdiction. This action should be remanded back to that proper forum.

**B.    The Respondent Sheriffs Are State Officials for Whom This Court Cannot Declare Their Duties Under State Law.**

The doctrine of federalism under the 11th Amendment announced in *Pennhurst* prohibits a federal court from instructing "state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).  Since the entire thrust of this action is to have a court give just such a declaration, this federal Court must remand to the state court which has that power.

Respondents claim to avoid this prohibition by saying that, as Sheriffs in their respective counties, they are not "state officials." This question of the status of Wisconsin sheriffs has been addressed previously by the Seventh Circuit. In *Soderbeck v. Burnett Cnty.,* 821 F.2d 446 (7th Cir. 1987), the Seventh Circuit held that a Wisconsin county sheriff was not a policymaker for their county, but was a state official when fulfilling constitutional obligations. The federal court thus had no power to entertain a suit against a Wisconsin county sheriff. *See id*.

Subsequent to that decision, the Wisconsin Legislature passed Wis. Stat. §895.46(1)(a) which provides that counties would be liable for judgments against Sheriffs. With that change in financial responsibility, a decision cited by Respondents, *Abraham v. Piechowski,* 13 F. Supp. 2d 870 (E.D. Wis. 1998) held that a Wisconsin sheriff could be sued under 42 U.S.C. § 1983 and was not entitled to 11th Amendment immunity.

Respondents urge that *Abraham* means that there is no limitation on this Court's ability to render judgment against them because they are simply county officials.

Even if *Abraham* were binding on this Court, it would not end the inquiry, because a sheriff can be a county official for some purposes and a state official for other purposes, as the Seventh Circuit ruled in *Scott v. O'Grady*:

> So, when a county sheriff in Illinois performs his duties as the principal executive officer or chief law enforcement officer of the county, he acts as a county official and does not get the benefit of the Eleventh Amendment. But this conclusion does not end our inquiry. The fact that O'Grady and Branch normally act as county officials does not mean that they can never act as an arm of the state.

975 F.2d 366, 371 (7th Cir. 1992).

In the context of this case, the Respondent Sheriffs should be treated as state officials for whom this Court should not be determining state law obligations under *Pennhurst*. To begin, each Sheriff plays a state role in an office established in the Wisconsin Constitution. *See* Wis. Const. art. VI, § 4, cl. (1). Only the governor has the power to remove a sheriff from office. *See* Wis. Const. art. VI, § 4, cl. (4); Wis. Stat. §§ 17.09(5), 17.11(1). The governor also controls the appointment of persons to fill vacant sheriff positions. *See* Wis. Stat. § 17.21(1). The Wisconsin Supreme Court has said that the sheriff "represents the sovereignty of the State." *Wisconsin Prof'l Police Ass'n v. Dane Cty.*, 106 Wis.2d 303, 309, 316 N.W.2d 656, 657 (1982). "A county may not intrude upon the powers and duties conferred upon constitutional officers through the exercise of its organizational and administrative powers." *Wisconsin Pro. Police Ass'n/L. Enf't Emp. Rels. Div. v. Dane Cnty.*, 149 Wis. 2d 699, 711, 439 N.W.2d 625, 630 (Ct. App. 1989)(citing Op.Att'y.Gen. No. 25–88 (May 23, 1988)).

With respect to honoring detainer requests, the Sheriffs are not acting as part of the justice system in their county. Holding someone in jail under a detainer is not pursuant to any directive of the circuit courts in their counties. In fact, the circuit courts in their counties have found that all state law bases for continued custody are gone. Nor is the Sheriff acting on behalf of the local District Attorney to prosecute any criminal offense in the County.

6

Nor do the Sheriffs, in signing 287(g) agreements, go to their county boards for approval or ratification of the contract.

In fact, in opposing the Petition, the Sheriffs are relying on their state official status. They told the Wisconsin Supreme Court that their office "is a constitutional office" and they have "constitutional duties and powers" which are "peculiar to the office of sheriff." Response, Dkt. 1-2, Ex. A. at 20. They cited language from *Andreski v. Industrial Commission*, 261 Wis. 234, 240, 52 N.W.2d 135 (1952) that the sheriff is "accountable only to the sovereign." Thus, in making decisions whether or not to honor ICE detainers, the Sheriffs have claimed to act pursuant to powers they assert flow from the state constitution, and consequently they should be treated as officials of the state for purposes of applying the *Pennhurst* doctrine.

Accordingly, *Abraham* is easily distinguishable. In that case, the sheriff was being sued for an arrest made in response to a discharge of a firearm. The case sought monetary damages from the defendants under section 1983. 13 F. Supp. 2d at 874-879. The court in *Abraham* focused its decision on the fact that the county would be paying any judgment under the newly passed statute, Wis. Stat. § 895.46(1)(b), in a damages lawsuit about enforcing local law, not federal immigration law. *Id.* at 878. In contrast, the present action seeks only prospective declaratory and injunctive relief, and Respondents, who rely on having state constitutional powers to make immigration arrests, acting without regard to county board, circuit court or district attorney, should be treated as subject to the Wisconsin Supreme Court, but not this Court, when it comes to matters of state law.

Respondents further assert that even if *Pennhurst* applies, the Court could continue to entertain the case and only abstain from prohibited kinds of relief. But there is no case or controversy between Petitioners and Respondents for a violation of federal law. Petitioners do not allege that the Respondents have violated any federal law, and the United States, in its statement of interest is apparently in agreement. (Statement of Interest of U.S., Dkt. 21 at 11-12). Petitioners' only causes of action are ones to declare Respondents in violation of state law, and this Court is constrained by the 11th Amendment from awarding the requested relief. Only a state court can hear the case, and so remand is a necessary

7

consequence of the existence of 11th Amendment immunity here. *See Keenan v. Washington Metro. Area Transit Auth.*, 643 F. Supp. 324, 335 (D.D.C. 1986) (finding that transit agency that had removed action to federal court was entitled to 11th Amendment immunity under *Pennhurst*, court remanded entire matter).

**C.     Removal Is Not Proper Under 28 U.S.C. § 1441.**

Respondents and the United States argue that federal law authorizes such arrests, creating a federal issue permitting removal under 28 U.S.C. § 1441.  But Petitioner is not asserting in this case that *federal* law prohibits detainers. Petitioner is simply asking the Wisconsin Supreme Court to rule that *state* law does not permit Wisconsin law enforcement to hold people based on detainers.

Respondents are forced to concede the basic proposition that federal issues, which are raised only through defenses, do not provide a basis for removal.  Instead, Respondents claim such federal issues so predominate over the state law claims that removal is allowed under the narrow exception created by the U.S. Supreme Court decisions in *Grable & Sons Metal Prod. v. Darue Eng. & Mfg.*, 545 U.S. 308 (2005) and *Gunn v. Minton*, 568 U.S. 251 (2013). This is a very thin exception and not one that is applicable here. The Supreme Court has emphasized that the *Grable* exception is a "slim category" and one needs more in a case than a federal issue "to open the 'arising under' door." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 701 (2006) (quoting *Grable*, 545 U.S., at 313).  *See also Hartland Lakeside Joint No. 3 Sch. Dist. v. WEA Ins. Corp.*, 756 F.3d 1032, 1033 (7th Cir. 2014) (discussing *Grable* and noting that where the complaint sounds in state law "the existence of a federal issue rarely allows removal").

The dispute in *Grable* centered on the action of a federal agency (IRS) and its compatibility with a federal statute, and the Supreme Court classified the question as "substantial," where its resolution was both dispositive of the case and would be controlling throughout the federal system. *Grable,* 545 U.S. at 315-16. In contrast, the present case does not meet the substantiality test since it centers on local sheriffs, the compatibility of their actions with state laws, and the resolution is particular to the State of Wisconsin and

its statutory scheme governing arrest authority. The merits of the claim depend almost entirely on state law. And state courts have a particular interest in adjudicating state officers' compliance with state law.

The Supreme Court's subsequent decision in *Gunn* further explained the substantiality element:

> [I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the state claim "necessarily raise[s]" a disputed federal issue, as *Grable* separately requires. The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole.

*Gunn*, 568 U.S. at 260. This case, brought specifically under Wisconsin law, affects a single state and not the federal system as a whole.

As in *Gunn*, the present case also flounders on the fourth element of the test for removal – the appropriate balance of federal and state judicial responsibilities. In *Gunn*, the issue was the state court's role in regulating lawyer conduct through malpractice litigation, which meant the federal courts should not disrupt those responsibilities by countenancing removal of a complaint pled under state law. *Gunn*, 568 U.S. at 264. Here as well, it cannot be suggested that the federal court system is the more appropriate setting for determining the state law responsibilities of state law enforcement officials.

To make their argument that removal is proper under federal question jurisdiction, Respondents spend pages mischaracterizing the Petition, asserting that the Petition asked the Wisconsin Supreme Court to issue a ruling broadly covering state and federal law arrest authority. The causes of action spelled out in the Petition, however, are simply that Wisconsin law prohibits Wisconsin Sheriffs from honoring ICE detainers. A determination on this question is the relief under Wisconsin's Uniform Declaratory Judgment Act which the Petition asks the Supreme Court to pronounce, and, if such arrests are illegal, to enjoin the practice. Pet. at 25-27. State courts in numerous other states have similarly decided whether their own state law prohibits their sheriffs from honoring ICE detainers, looking almost entirely to state law. *See Lunn v. Commonwealth*, 78 N.E.3d 1143 (Mass. 2017); *People ex rel. Wells v. DeMarco*, 88 N.Y.S.3d 518 (App. Div. 2018); *Ramon v. Short,* 460

9

P.3d 867 (Mont. 2020); *Esparza v. Nobles Cnty.*, Case No. A18-2011, 2019 WL 4594512, at *4–*5 (Minn. App. Ct. Sep. 23, 2019).

In opposing the Petition, Respondents asserted defenses that the Wisconsin law prohibition on such arrests is preempted by 8 U.S.C. § 1357(g).  But that is merely a defense—not enough to create federal jurisdiction.  And it is plainly frivolous under a mountain of case law and DHS statements that honoring detainers is purely voluntary.  Because this defense has been raised, the Wisconsin Supreme Court asked the parties to brief its viability.  (Sept. 23, 2025 Order, Dkt. 12-3, Ex. C).

Importantly, while Respondents say Wisconsin law is silent on their ability to make such arrests, the lack of explicit, enumerated arrest authority under Wisconsin statutes *is* a prohibition on making such arrests. The power to make arrests in Wisconsin is limited such that all arrests are prohibited if they are not authorized by statute. *City of Madison v. Two Crow*, 88 Wis. 2d 156, 159, 276 N.W.2d 359, 361 (Ct. App. 1979) (*citing Wagner v. Lathers*, 26 Wis. 436 (1870)) ("The power to arrest must be authorized by statute."); *see also State v. Wilks*, 117 Wis. 2d 495, 500, 345 N.W.2d 498, 500 (Ct. App. 1984). State officers are creatures of the state, and can only act where state law provides them with authority.  This means that only the Wisconsin legislature can grant Wisconsin law enforcement the authority to make arrests, and only the Wisconsin legislature can decide what conduct is subject to arrest by local and state law enforcement. *See* Wis. Stat. § 939.10 (common law crimes abolished).

Moreover, as the Petition asserts, Wisconsin law is not silent; it goes beyond simply not authorizing these arrests.  Since at least 1941, Wisconsin's law has expressly prohibited arrests in civil actions except for certain specified circumstances, none of them relevant here. Wis. Stat. § 818.01(1) ("No person may be arrested in a civil action except as prescribed by this chapter."); *see State v. Hess*, 2010 WI 82, ¶ 25, 327 Wis. 2d 524, 537, 785 N.W.2d 568, 575 ("In a civil action, arrests are to be made only 'as prescribed by [Wis. Stat. § 818.01(1)].'")

Thus subsections 1357(g)(1) and (g)(10) only become issues in this case because Respondents are arguing as a defense that those federal statute sections preempt the

prohibition on immigration arrests in Wisconsin law. To the extent that Respondents are arguing that these sections of a federal statute can provide them with arrest authority under Wisconsin law, it is still a state law question. The question would be: if there is no arrest authority under Wisconsin statutes to make immigration arrests, does Wisconsin law allow a Sheriff to get that authority from another source outside of state law? *See also* 8 U.S.C.§ 1357(g)(1) (granting no authority unless such authority is "consistent with State and local law").[2]

Similarly, the Wisconsin Supreme Court instruction that the parties' briefing in this case address the requirement that 287(g) agreements be "consistent with State and local law" shows the focus of that Court on its role as the ultimate authority on the meaning of Wisconsin law. Only its ruling can be definitive on whether honoring immigration detainers is, or is not, a violation of Wisconsin law.

**D.   Respondents Fail to Show They Are Entitled to Removal Under 28 U.S.C. § 1442.**

**1.   Respondents' Pre-Emption Defense Fails to Pass The "Colorable" Threshold.**

**a)   Respondents' Single Sentence Pre-Emption Assertion is Utterly Frivolous.**

Even if § 1357(g)(1) did not require that any 287(g) agreement be "consistent with State and local law," Respondents still would have no colorable argument that the provision preempts Petitioner's interpretation of Wis. Stat. § 818.01(1). The Seventh Circuit's decision in *McHenry County v. Raoul* precludes any argument that a statute, like § 1357(g)(1), that provides states and political subdivisions the choice to assist federal law

---

[2] Respondents argue they might have "inherent authority" to make such arrests, but no state court which has looked at the issue in the context of civil immigration detainers, has ever endorsed such an amorphous concept. Again, this authority could not overcome a statutory scheme like Wisconsin's which does not permit such arrests. *See Lunn v. Commonwealth*, 78 N.E.3d 1143, 1157 (Mass. 2017)(declining to find inherent or implicit authority to make immigration arrests where no authorization existed under state law); *People v. Demarco*, 168 A.D.3d 31, 88 N.Y.S.3d 518 (N.Y. App. Div. 2018)(same).

enforcement can simultaneously preempt state law.  And when Congress offers states and subdivisions a choice to enter into an agreement, or to cooperate in some other way with federal law enforcement, "[i]t simply does not command that they do so." *McHenry Cnty. v. Kwame Raoul*, 44 F.4th 581, 589 (7th Cir. 2022).

*McHenry County* illustrates this common-sense principle. There, the Seventh Circuit considered the effect of 8 U.S.C. § 1103(a)(11)(B) on the Illinois Way Forward Act. The Act provided that neither law enforcement agencies and officials nor "any unit of State or local government may enter into or renew any contract . . . to house or detain individuals for federal civil immigration violations." *McHenry Cnty.*, 44 F.4th at 586 (quoting 5 ILCS 805/15(g)(1)). The Act also required any entity with an existing contract to terminate their agreement as applied to housing or detaining individuals for civil immigration violations. *Id.* (citing 5 ILCS 805/15(g)(2)).

Two counties with such contracts sued, alleging that the Act was preempted by § 1103(a)(11)(B), which says that the Attorney General "is authorized . . . to enter into a cooperative agreement" with states or political subdivisions to detain and provide beds for people detained by federal immigration officials. *Id.* at 585-86. The counties argued that this provision preempted, via field and conflict preemption, the Illinois Way Forward Act's bar on entering into these cooperative agreements and the Act's requirement that existing agreements be terminated. *Id.* at 587. Because the federal provision provided political subdivisions (in addition to the states) the choice to enter into these agreements, any state law constraining that choice was necessarily preempted, the counties argued.

The Seventh Circuit disagreed. "[U]nder the federal Constitution, political subdivisions 'have been traditionally regarded as subordinate governmental instrumentalities,'" the Court said. *Id.* at 590 (quoting *Reynolds v. Sims*, 377 U.S. 533, 575 (1964)). Because of that, "we operate under a 'working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read it in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory [v. Ashcroft*, 501 U.S. 452 (1991)] requires.'" *Id.* (quoting *Nixon v. Missouri Mun. League*, 541 U.S.

12

125, 140); *see also United States v. California*, 921 F.3d 865, 887 (9th Cir. 2019) ("[I]t is a state's historic police power—not preemption—that we must assume, unless clearly superseded by federal statute.")

To the extent Respondents argue that § 1357(g)(1) and (10) preempts any state law that interferes with the ability of political subdivisions (like Sheriffs' Offices) to make their own choices about cooperating with federal law enforcement's civil immigration enforcement, they cannot get around *McHenry County*.

And *McHenry County* is not an outlier. The Ninth Circuit has similarly held that statutes that offer states a choice to cooperate cannot simultaneously preempt. In *United States v. California*, the Ninth Circuit analyzed § 1357—the same federal statute at issue here—and held that it, among other federal immigration provisions, did not require states to cooperate with federal immigration enforcement. 921 F.3d at 887. "Federal law does not suggest the intent—let alone a clear and manifest one—to prevent states from regulating whether their localities cooperate in immigration enforcement," the Court explained. *Id*. at 887 (citation and quotations omitted).

The Fifth Circuit has adopted this same understanding. *City of El Cenizo v. Texas* involved the same facts as *California* but flipped—the state required cooperation with federal immigration enforcement, and the localities sued, arguing that federal law preempted Texas law. The Fifth Circuit disagreed. "Section 1357 does not require cooperation at all," the court explained. *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018). § 1357 instead offered states a choice. "And the savings clause allowing cooperation without a 287(g) agreement [i.e., § 1357(g)(10)] indicates that some state and local regulation of cooperation is permissible." *Id*. at 178.

When a statute offers states the choice of cooperation, it cannot be said to preempt state law. *See California*, 921 F.3d at 887 ("SB 54 does not directly conflict with any obligations that the INA or other federal statutes impose on state or local governments, because federal law [with an exception not relevant here] does not actually mandate any state action."); *McHenry County*, 44 F.4th at 592 ("the choice of a state to refrain from

13

participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal") (quoting *California*, 921 F.3d at 890).

Nor does it matter that federal immigration enforcement might be frustrated by a state's decision not to cooperate. True, it might be easier for federal officers to discharge their duties with state and local cooperation, but state laws that prohibit such cooperation "don't make ICE's job more difficult; they just don't make it easier." *United States v. Illinois*, 796 F. Supp. 3d 494, 529 (N.D. Ill. 2025). Indeed, "refusing to help is not the same as impeding." *California*, 921 F.3d at 888 (quoting *California I*, 314 F. Supp. 3d 1077, 1104 (E.D. Cal. 2018)). "If such were the rule, obstacle preemption could be used to commandeer state resources and subvert Tenth Amendment principles." *Id.*; *see also City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in unrelated part* by Nos. 17-2991 & 18-2649, 2018 WL 4268814 (7th Cir. Aug. 10, 2018) (en banc)) (refusal of local law enforcement to aid in civil immigration enforcement is not "affirmative interference").

In sum, *McHenry County* squarely forecloses any argument that a federal law that gives states a choice to cooperate with federal law enforcement can simultaneously preempt state law barring such cooperation.

b) **Because §§ 1357(g)(1) and (10) do not regulate private actors, they cannot validly preempt state law.**

There is a second reason Respondents lack a colorable preemption argument. Their attempt to allege a preemption defense also fails because, for a federal law to preempt state law, the federal law must regulate private actors, and the subsections of § 1357 do not. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (noting that because the Constitution "confers upon Congress the power to regulate individuals, not States," the federal law at issue could only validly preempt state law if it could be read to regulate private actors) (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)). This is true regardless of the type of preemption claimed—express, conflict, or field. At the end of the day, "all of them work in the same way: Congress enacts a law that imposes restrictions or

14

confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id*.

In *Murphy*, the Supreme Court held that a federal statute making it "unlawful" for a State or any of its subdivisions "to sponsor, operate, advertise, promote, license, or authorize by law or compact" certain kinds of gambling could not preempt state law because it did not regulate private actors, but was instead squarely aimed at the states. *Id*. 461, 477–80. In so holding, the Court clearly explained the difference between federal statutes that validly preempt state law and those that do not. In contrast to *Murphy* itself, cases where the Court had found valid preemption involved federal statutes that directly operated on private actors: a law prohibiting generic drug manufacturers from altering either the composition or labeling approved by the Food and Drug Administration (*Mutual Pharmaceutical Co. v. Barlett*, 570 U.S. 472 (2013); a law conferring on airline carriers a right to operate subject "subject only to certain (federal) constraints" (*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992); and a law regulating surface coal mining companies that offered states the choice between implementing the federal regulatory program themselves or allowing the federal government to implement the program (*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981)). *Murphy*, 584 U.S. at 476–78.

Those valid instances of preemption stand in contrast to the alleged preemption here. It is simply not possible to read § 1357(g)(1) or (10) as aimed at private actors. For instance, the only actors § 1357(g)(1) confers a federal right or responsibility to are "the Attorney General," "a State," "any political subdivision of a State," and "an officer or employee of the State or subdivision." The only actors § 1357(g)(10) confers a federal right or responsibility to are "the Attorney General" and "any officer or employee of a State or political subdivision of a State."

Other courts have agreed that provisions that mention only those actors cannot be read to regulate private actors. In *Ocean County Board of Commissioners v. Attorney General of State of New Jersey*, for instance, the Third Circuit held that §§ 1373 and 1644

15

of the INA could not preempt a New Jersey law that barred counties and local law enforcement from assisting federal immigration authorities by, among other things, providing access to local law enforcement databases or providing notice of a detained individual's upcoming release from custody. 8 F.4th 176, 178–79, 181–82 (3d Cir. 2021).

As the Third Circuit noted, "Section 1373 says that a 'State . . . entity or official may not prohibit, or in any way restrict, any government entity or official' from sharing immigration information with federal authorities." *Id*. at 181 (quoting 8 U.S.C. § 1373(a)). Because that provision "sa[id] nothing about private actors," the Court said, "it [could not] be fairly read to regulate them." *Id*. at 182. So, too, of § 1644, which provides that "'no State or local government entity may be prohibited, or in any way restricted' from communicating immigration information to the federal government." *Id*. at 182 (quoting 8 U.S.C. § 1644). Though the provision "does not specify who may not prohibit or restrict state action," the Court said, "the best reading . . . is that it does not regulate private actors" because private actors cannot prohibit or restrict state action—only a state can do that. *Id*.

The fact that neither provision regulated private actors was "fatal" to the appellant's preemption argument. Indeed, the Court did not even bother to analyze the various kinds of preemption or address the appellee's argument that the provisions violated the anticommandeering doctrine. *Id*.

Similarly, in a comprehensive opinion surveying preemption and anti-commandeering doctrine, the Northern District of Illinois in *United States v. Illinois* also held that § 1373 cannot be read to regulate private actors. 796 F.Supp.3d at 520 (collecting cases). Again, that provision is directed at the very same actors at which § 1357(g)(1) and (10) are directed. § 1373 "doesn't alter what private individuals can or cannot do or affect their citizenship or immigration status," the Court said. *Id*. at 521. The same is true of §§ 1357(g)(1) and (10), which speak only to state and local government and state and local government employees' ability to contract or cooperate with the federal government.

These cases present a clear-cut, uncomplicated rule: if the federal law does not regulate private actors, the analysis ends. Respondents' fail to overcome this bright-line rule.

16

### 2. Respondents are not acting under federal agents when they honor ICE detainers.

Respondents rely on the fact that a federal agency, ICE, sends them detainer requests, to argue that they themselves magically become federal officers. To work alongside a federal agency is insufficient for purposes of § 1442. "Acting with" is not the same thing as "acting under," because the "acting under" element of § 1442 requires a superior-subordinate relationship. In this case, however, Respondents retain the ability to not honor ICE detainers as they so choose (even once they have signed 287(g) agreements). Accordingly, Respondents are not "acting under" the federal government and are not magically transformed into federal officers when they do choose to do so.  The voluntariness makes the relationship a cooperation, not a "principal-agent" or "superior-subordinate" relationship that would implicate § 1442.[3]

There may be aspects of control over certain parts of that cooperative relationship to implicate § 1442, but there are not, and indeed cannot be, control over a Sheriff's decision to use his jail, his funds, his staff, or his tools of incarceration to honor a voluntary ICE detainer request. To hold otherwise would violate the anti-commandeering tenets of the Tenth Amendment. See *Galarza v. Szalczyk*, 745 F.3d 634, 645 (3rd Cir. 2014)("Under the Tenth Amendment, immigration officials may not order state and local officials to imprison suspected aliens subject to removal at the request of the federal government. Essentially, the federal government cannot command the government agencies of the states to imprison persons of interest to federal officials.")

---

[3] At the time of filing the petition before the Wisconsin Supreme Court, only one Sheriff, Delain of Brown County, had executed a 287(g) agreement with ICE. See listing and dates of participating agency agreements at https://www.ice.gov/identify-and-arrest/287g. In fact, two, Kenosha and Walworth, signed agreements only after the notice of removal was filed.  Counsel for Respondents, Attorney Hall, stated in a television interview that he was advising clients to sign 287(g) agreements to allow them to honor detainers. (*Lawsuit fight intensifying questioning whether Wisconsin sheriffs can assist ICE*, WISN12, Feb. 1, 2026, available at https://www.wisn.com/article/lawsuit-fight-intensifying-questioning-whether-wisconsin-sheriffs-assist-ice/70204286).
For purposes of assessing removal, only the Brown County 287g agreement would be relevant since removability is judged as of the date of the original filing of the petition. *See Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 390 (1998) ("[F]or purposes of removal jurisdiction, we are to look at the case as of the time it was filed in state court— prior to the time the defendants filed their answer in federal court.")

At the moment of deciding to accede to a detainer request, a sheriff is not a federal officer, but is still a Wisconsin sheriff, a position created under and with all of its legal authority deriving from the Wisconsin Constitution.

Respondents do not dispute that ICE detainers are voluntary requests. Similarly, they do not dispute that they are free to disregard any detainer request they receive, even if they have signed a 287(g) agreement which also does not require Respondents to take any specific action and explicitly disclaims any authority granted that would conflict with state law. In other words, *vis-à-vis* the detainer decision, the agreements do not create a superior-subordinate relationship; they create a cooperative relationship at most, and are without impact whatsoever to the extent their provisions conflict with state law. That distinction matters.

The element is not "acting with," but instead "acting under" which implies a relationship of control:

> The relevant relationship is that of a private person "acting under" a federal "officer" or "agency." 28 U.S.C. § 1442(a)(1). In this context, the word "under" must refer to what has been described as a relationship that involves "acting in a certain capacity, considered in relation to one holding a superior position or office." 18 Oxford English Dictionary 948 (2d ed.1989). That relationship typically involves "subjection, guidance, or control."

*Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007); *see also Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022); *Att'y Gen. of New Jersey v. Dow Chem. Co.*, 140 F.4th 115 (3d Cir. 2025).

Respondents seem to assume that any time local or state government works with the federal government, it "acts under" the federal government. Not so. Many appellate decisions have recognized the distinction between "working with" and "acting under."

In *Buljic v. Tyson Foods*, for instance, the Eighth Circuit noted that "acting under" requires directives from a superior. *See* 22 F.4th 730, 741 (8th Cir. 2021) (noting that the federal government's statements to Tyson during the COVID-19 pandemic "indicate that the federal government was encouraging Tyson—and other industries—to continue to

18

operate normally [,] [b]ut they did not direct or enlist Tyson to fulfill a government function or even tell Tyson specifically what to do.").

The fact that Respondents, including those with 287(g) agreements, still have the choice to not honor ICE detainers indicates that Respondents retain their "complete, independent discretion," over whether to detain individuals for civil immigration violations. *Tyson,* 22 F.4th at 741.

Respondents therefore are not "acting under" the federal government when they honor ICE detainers because the federal government has given them no such directive. The federal government, through sending ICE detainers to county sheriffs, has instead "embraced a cooperative approach, continu[ing] to recognize the authority of state and local officials, and merely encourag[ing]" such action, as the Court explained was insufficient in *Tyson Foods*. *Id.*

Even when the federal government imposes certain conditions on its cooperation with a state or local government, the state or local government is not automatically "acting under" the federal government. In *Mays v. City of Flint*, for instance, the Sixth Circuit found that a state agency enacting drinking-water standards that had to at least meet the federal government's standards—but could exceed them—was not "acting under" the federal government. 871 F.3d 437, 446 (6th Cir. 2017) ("Although Michigan's laws had to comply with the standards set forth in the SDWA and its accompanying regulations in order for the MDEQ to obtain primary enforcement authority, Michigan was free to enact more stringent requirements for the protection of its residents. . . .  That Michigan decided to enact a regulatory scheme that essentially mirrors the federal one does not mean that Michigan was required to do so.").

So, too, here. While federal law (and the 287(g)s themselves) prohibit Respondents from carrying out certain immigration enforcement actions absent permission from the federal government, Respondents retain the discretion to not carry out those actions, when they do have authorization from the federal government. That is the sort of "joint Federal-State system" that the *Mays* court said was a "model of cooperative federalism, not an agency relationship." 871 F.3d at 447.

The two cases relied upon by Respondents, *Castillo* and *Amancio*, are unpersuasive. Castillo focuses heavily on *Watson*'s reference to a "principal/agent" relationship. *See Castillo v. Snyders*, 497 F.Supp.3d 299, 303 (N.D. Ill. 2020) ("[T]he Supreme Court in *Watson* indicated that voluntary agreements could be sufficient when it included 'principal-agent' in the list of special relationships that could give rise to removal."). But in defining a principal-agent relationship—as a relationship formed "when one party manifests assent to act on behalf of a principal and subject to its control, and that principal manifests assent to the relationship," *id.,*—the *Castillo* court never explains how the defendant sheriff's decision to honor the detainer at issue could have been subject to ICE's control, when the sheriff retained the discretion to either honor the detainer or not honor it.

Indeed, the *Castillo* court never analyzes the "control" element of the principal-agent relationship except to say without explanation that "the Sheriff has consented to act on behalf of ICE officers and at their direction to hold suspects for a specific amount of time." *Id*. at 304. But the "control" element of the principal-agent relationship is crucial. *See State v. Arrington*, 2022 WI 53, ¶ 49, 402 Wis.2d 675, 701, 976 N.W.2d 453, 466 ("Generally, an agent has the duty to obey all reasonable directions as to its manner of performing the service it has agreed to perform. . . . What matters in forming an agency relationship is that the principal has the right to control that conduct."); *Lang v. Lions Club of Cudahy Wis., Inc.*, 2020 WI 25, ¶ 30, 390 Wis.2d 627, 645, 939 N.W.2d 582, 591 ("The principal's right to control the injury causing conduct is crucial to both the existence of an agency relationship and the scope of the agency. . . . [W]ithout the right to control the injury causing conduct, an agency cannot exist relative to that conduct.").

The federal government has no control over whether a sheriff does or does not honor an ICE detainer. *See* Mem. in support of Mot. to Remand at 21 (section on how detainers are voluntary). Without that control, there cannot be an agency relationship sufficient for purposes of § 1442.

The *Amancio* court's analysis fares no better. Indeed, the *Amancio* court never even acknowledged that compliance with ICE detainers is voluntary. Instead, it repeatedly adopted the defendant Sheriff's statement that the Sheriff had "received a detainer from a

Federal Immigration Officer . . . notifying him to maintain custody of" the plaintiff—as if the ICE detainer were a command. *Amancio v. DePerry*, 654 F.Supp.3d 145, 151–52 (D. Conn. 2023). In that assumption, the court was simply wrong. *See Galarza v. Szalczyk*, 745 F.3d 634, 640–41 (3d Cir. 2014) (noting that "[a]ll Courts of Appeals to have commented on the character of ICE detainers refer to them as 'requests' or as part of an 'informal procedure'" and collecting cases). And in any event, the plaintiff in *Amancio* did not challenge Defendant's characterization of the ICE detainer request as a command. *See id*. at 152 (noting Defendant "asserts—and [Plaintiff] does not dispute—that he 'received a detainer from [ICE] notifying him to maintain custody" of the Plaintiff and stating that the Plaintiff "appears to concede that Defendant was following the guidance of a federal officer").

Simply put, not every federal-state or federal-local relationship in which a state or local government assists the federal government transforms into a principal-agent relationship where the state or local agency is "acting under" a federal official. Any other interpretation is foreclosed by the anti-commandeering precept of the 10th Amendment. "Congress cannot compel the States to enact or enforce a federal regulatory program….Congress cannot circumvent that prohibition by conscripting the State's officers directly." *Printz v. U.S.*, 521 U.S. 898, 935 (1997).

Finally, even if Respondents could somehow show they act under the control or authority of federal officers as some part of their cooperative relationship, the voluntary nature of deciding whether or not to accede to a detainer requests, defeats the addtional nexus requirement of section 1442. *See* Memo. in Support, Dkt. 12 at 21-23.

## CONCLUSION

For all the foregoing reasons, this action should be remanded to the Supreme Court of Wisconsin and Petitioner awarded its costs and attorney fees related to bringing this motion.

Dated: March 6, 2026          Respectfully submitted,


By:_ /s R. Timothy Muth_____

R. TIMOTHY MUTH
WI Bar No. 1010710
tmuth@aclu-wi.org
HANNAH R. SCHWARZ
WI Bar No. 1143527
hschwarz@aclu-wi.org
RYAN V. COX
WI Bar No.1140899
rcox@aclu-wi.org


ACLU OF WISCONSIN FOUNDATION
207 E. Buffalo Street, Suite 325
Milwaukee, WI 53202
Phone: 414-272-4032

ATTORNEYS FOR PETITIONER
VOCES DE  LA FRONTERA, INC.

22